UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Katrina Coleman,

      Plaintiff,

v.                            Case No. 12-11154

Cardinal Health 200, LLC,        Sean F. Cox
                                  United States District Court Judge

      Defendant.

_____/

**OPINION & ORDER**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff filed this action against her former employer, alleging race discrimination and retaliation in violation of Title VII. The matter is currently before the Court on Defendant's Motion for Summary Judgment. The parties have briefed the issues and the Court heard oral argument on October 31, 2013. For the reasons set forth below, the Court shall GRANT Defendant's Motion for Summary Judgment and rule that: 1) Plaintiff has only two exhausted claims that she can pursue in this litigation; 2) Defendant is entitled to summary judgment with respect to the first exhausted claim because the alleged adverse action that it is based upon (placing Plaintiff on a performance improvement plan) is not considered an adverse action as a matter of law, and Plaintiff was never actually placed on one anyway; and 3) Defendant is entitled to summary judgment with respect to Plaintiff's second exhausted claim because Plaintiff has not submitted sufficient evidence from which a reasonable jury could conclude that Cardinal Health's legitimate, nondiscriminatory reasons for selecting her for the reduction in force are a pretext for unlawful retaliation.

1

# BACKGROUND

Plaintiff Katrina Coleman ("Plaintiff" or "Coleman") filed this action against Cardinal Health 200, LLC ("Defendant" or "Cardinal Health") on March 15, 2012, alleging race discrimination and retaliation claims under Title VII.

Following the close of discovery,[1] Cardinal Health filed a Motion for Summary Judgment. This Court's practice guidelines for motions for summary judgment provide, in pertinent part, that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

The parties complied with the Court's practice guidelines for motions for summary judgment such that: 1) along with Cardinal Health's Motion for Summary Judgment, it included

---

[1]During discovery, Coleman withheld from Cardinal Health various tape recordings that she had made of conversations during her employment. Magistrate Judge Hluchaniuk issued an order granting Cardinal Health's Motion for Sanctions as to that conduct. (*See* Docket Entry No. 28). He found that Coleman's conduct in not turning over the tapes was willful, he ordered that she could not use any of the withheld tapes in this litigation, but he declined to award attorney fees or costs. Neither party has asked the Court to consider any audio recordings in connection with the pending motion.

a "Statement of Undisputed Facts" ("Def.'s Stmt.") (D.E. No. 29-2 at Pg ID 328); and 2) along with Coleman's Response Brief she filed a "Counter Statement of Disputed Facts And Plaintiff's Issues Of Material Fact Supporting A Genuine Issue For Trial" (Pl.'s Stmt") (D.E. No. 34 at Pg ID 605). Plaintiff's Stmt. is divided into two sections: 1) the first section, wherein she responds to Defendant's Statement; and 2) a second section, wherein she asserts facts she contends are undisputed. The Court shall refer to the second section of Plaintiff's Statement as "Pl.'s Stmt. B." In addition, along with its Reply Brief, Cardinal Health submitted a Response To Plaintiff's Stmt. B", which this Court shall refer to "Def.'s Reply Stmt." (D.E. No. 37 at Pg ID 1090).

The following material facts are gleaned from the parties' statements and the evidence submitted by the parties, taken in the light most favorable to Coleman, the non-moving party.

Coleman is African-American. Coleman began her employment with Cardinal Health on July 20, 2009. (Def.'s Stmt. at ¶ 1; Pl.'s Stmt. at ¶ 1). Throughout her employment, she worked as a sales representative in the ambulatory care sales group. (*Id*. at ¶ 2). The ambulatory care sales group sells medical and pharmaceutical products to physician offices, surgical centers, and rehabilitation hospitals. (*Id*. at ¶ 3).

At all times, Coleman's territory consisted of Northern Ohio (metropolitan Toledo) and parts of Southeastern Michigan, excluding Detroit. Her territory was part of the Midwest Region. (Def.'s Stmt. at ¶¶ 4-5; Pl.'s Stmt. at ¶¶ 4-5). Her territory was a "start-up territory" (ie., a newly-created territory that did not exist prior to her employment with Cardinal Health).

From July 2009 through May 2010, Coleman reported to Regional Manager Tara O'Dell ("O'Dell"). (Def.'s Stmt. at ¶¶ 8-9; Pl.'s Stmt. at ¶¶ 8-9). O'Dell was the manager who hired Coleman. (Pl.'s Dep. at 150).

3

In a February 2010 memo to Coleman, O'Dell recapped feedback that she had given

Coleman on her performance.  (Def.'s Stmt. at ¶ 20; Pl.'s Stmt. at ¶ 20; Ex. L to Def.'s Br.).  In

that memo, O'Dell criticized Coleman for "not progressing as well as I would have hoped," and

for "minimal to no execution" on her pipeline of potential new business.  (Def.'s Stmt. at ¶ 21;

Pl.'s Stmt. at ¶ 21).  O'Dell expressed concern that Coleman does "not have a plan to make a

plan" and noted that 58% of Coleman's customer volume was down compared to the prior year.

O'Dell observed that, "Currently your territory cannot support your salary and expenses."  O'Dell

also criticized Coleman for lack of preparedness at meetings, calling the flow "very clumsy" and

indicating that "critical homework on your end was not completed."  (*Id.*)  O'Dell further

criticized Coleman for poor listening skills, indicating that after asking questions, Coleman "did

not follow thru or listen for the response."  She also criticized Coleman for providing "inaccurate

information" to a customer about an inventory system.  (*Id.*).

Coleman did not agree with her supervisor's criticisms of her and wrote O'Dell a four-

page letter in response to the memo.  (Ex. 11 to Pl.'s Br.).  In that letter, Coleman stated that

certain goals that had been set for her were "unrealistic for a new hire with a start-up territory."

(*Id.*).  Coleman claimed that certain statements in O'Dell's memo were "untrue" or "misstated."

With respect to O'Dell's statements that she was discouraged that Coleman was not further

along, Coleman stated that "is very disheartening and de-motivating."  Noting that O'Dell had

said on a few occasions that she did not think the job was a good fit for Coleman, Coleman stated

that:

> As a result since that time, I felt that my job was threatened at all times despite my
> accomplishment as a new rep.  Also on Feb 3rd you made various comments that
> validated my fears such as:

4

- "I only regret hiring three people in my career".
- "Only family can't get fired".
- "I fired Ann Dolan because we did not see eye to eye".
- "I didn't fire you months ago during our tough love conversations because you took constructive criticism very well . . . you did not get defensive with me at all."

(*Id.* at 3).  Coleman stated, "Since being hired, I feel that I have not received adequate support, direction or motivation from you that's needed to be successful at Cardinal."  (*Id.*).  She closed the letter by stating "[a]s we move forward, I hope we can mend this disconnect" and "I need you to be more supportive."  (*Id.* at 4).

From May 2010 through September 2010, Coleman reported to interim managers Brent Zaremski and Nikki Evans.  (Def.'s Stmt. at ¶¶ 8-9; Pl.'s Stmt. at ¶¶ 8-9).

In September 2010, Jay Hughes ("Hughes") became Coleman's Regional Manager. (Def.'s Stmt. at ¶ 31; Pl.'s Stmt. at ¶ 31).  Hughes, like Coleman, is African-American. (Hughes Dep. at 17).[2]  Hughes was a direct report to Brian Rudd ("Rudd").

O'Dell completed Coleman's annual review and dated it June 2010, but the reviews were not given to any of the sales representatives until October 2010, after Hughes took over as Midwest Regional Manager.  (Def.'s Stmt. at ¶ 25; Pl.'s Stmt. at ¶ 25).  Hughes, therefore, was the manager who showed Coleman the June 2010 review, but the review itself was completed entirely by O'Dell.  (*Id.*).

In that review, O'Dell gave Coleman an overall rate of "Needs Improvement" on a rating

_____

[2]There are two errors in the version of the deposition transcript of Hughes that was filed by Cardinal Health.  On page 17, where Hughes testified that he is African-American, the transcript also states that: 1) he came to oversee "Jay Hughes" and 2) that "Jay Hughes" accused him of discrimination.  As stated on the record at the hearing, the parties agree that those two references were actually made as to Coleman – not to Hughes.

5

scale of: 1 for unsatisfactory, 2 for needs improvement, 3 for on target, 4 for above target, and 5 for outstanding.  (Def.'s Stmt. at ¶ 26; Pl.'s Stmt. at ¶ 26).  As to specific performance goals, O'Dell rated Coleman below target (score: 2.5) in gross profit / sales; needs improvement (score: 2) in reaching pharmaceuticals quota; and unsatisfactory (score: 1) in reaching EMR quota.  (Def.'s Stmt. at ¶ 27; Pl.'s Stmt. at ¶ 27).  The comments section of the review, on performance and goals, states that "Katrina is on track to exceed her sales and GP quota.  This is largely due to a Select account which was won at a National Level by our Health Systems team.  If you take out Select she is on track to miss her GP quota by 1,000 bp or apx 90% to gp plan."  (Ex. K to Def.'s Br.).  The comments section of the review, on overall performance, states:

> Katrina and I are clearly not on the same page regarding her FY10 performance. This is very disappointing, as we have had several verbal and written conversations regarding this subject.
>
> Through out the year, Katrina has challenged feedback and coaching.  It would be to Katrina's benefit to be concerned about her own performance and expectations vs. comparing to other sales reps.  Constructive feedback is provided to help improve and should be received with an open mind – those in leadership positions have the experience to help guide.
>
> . . . .
> Katrina needs to effectively build her pipeline; she currently is not well positioned for a successful FY11.

(Ex. K to Def.'s Br.).

Coleman testified that by October 2010, which was one month after Hughes became her supervisor, she knew that she was expected to grow her territory through her own efforts, and not merely make sales by inheriting national accounts.  (Pl.'s Dep. at 176).

In January 2011, Hughes prepared a Performance Improvement Plan ("PIP") for Coleman.  (Def.'s Stmt. at ¶ 35; Pl.'s Stmt. at ¶ 35).  The PIP drafted by Hughes stated that

"[f]rom October 1st 2010 to January 1st, 2011, while there has been a slight improvement in gross profit growth, the controllable growth (growth outside of any national agreements) is well below expectations that Cardinal has for any of its consultants." (Ex. 5 to Pl.'s Br.).

Coleman disagreed with the PIP Hughes had drafted. Hughes then revised the PIP. Coleman was still unhappy about the revised PIP Hughes had prepared and complained to Debbie Kincaid ("Kincaid") in Human Resources. (Def.'s Stmt. at ¶ 47; Pl.'s Stmt. at ¶ 47). Hughes later withdrew the PIP and instead created a coaching plan called a Strategic Training Assessment Report ("STAR"). (Def.'s Stmt. at ¶ 48; Pl.'s Stmt. at ¶ 48). It is undisputed that neither version of the PIP ever went into effect.

The STAR was delivered to Coleman on February 8, 2011 via e-mail. (Def.'s Stmt. at ¶¶ 49-50; Pl.'s Stmt. at ¶¶ 49-50).

On or about February 10, 2011, Coleman reported to Human Resources that she believed Hughes was discriminating against her on the basis of her race. (*See* Pl.'s First EEOC Charge). When Coleman told Kincaid that she thought Hughes was discriminating against her because of her race, Kincaid replied, "Well, Jay is the of the same race as you." (Kincaid Dep. at 23). Coleman then stated, "Yes, but I think he's discriminating against me because of my hairstyle. I have a very ethnic hairstyle." (*Id*.). Thereafter, Kincaid contacted Cardinal Health's Advice & Counsel Center and they commenced an internal investigation of Coleman's complaint. (Kincaid Dep. at 23).

The STAR was thoroughly explained to Coleman on February 21, 2011, by Hughes during a telephone call. (Def.'s Stmt. at ¶¶ 49-50; Pl.'s Stmt. at ¶¶ 49-50; *see also* Ex. F to Def.'s Br., a copy of the STAR). Coleman was told by both Hughes and Kincaid that there were

no disciplinary repercussions attached to the STAR.  (Def.'s Stmt. at ¶ 51; Pl.'s Stmt. at ¶ 51).

The STAR had various goals that were to be met by Coleman by either March 15, 2011 or April

15, 2011.  (Ex. F to Def.'s Br.).

On February 18, 2011, Hughes sent an e-mail to Rudd and some other managers at

Cardinal that stated:

> I am sending this to you as my peers, but more importantly, as managers that may
> have had some interaction with one of my employees, Katrina Coleman.
>
> As you know, there have been some challenges with Katrina for some time.  In
> fact, based on conversations had and/or documentation received over the past 18
> months from five separate managers or trainers, the issues that I have experienced
> in the short four months I have been a region manager are consistent with what
> others have experienced.
>
> That said, **the situation with Katrina has escalated in an ugly way**.  Originally,
> I proposed a PIP, but via the guidance of HR was recommend to do a "STAR"
> analysis or "pre-PIP".  I have attached both the STAR analysis and Katrina's
> response.  As you can see by her response, she is making accusations that are
> completely unfounded. It seems to be very clear that she is looking to build a legal
> case against Cardinal and/or me.  I have consulted HR throughout and do not feel
> in any way that I (or anyone else at Cardinal) has done anything wrong.  However,
> and HR agrees, Katrina is seemingly a master or taking "bits" of conversations
> and twisting the meaning to attempt to drive a point via a *documented* email.  That
> said, all scheduled weekly live meetings that we had are now moved to weekly
> phone calls, allowing HR to join.
>
> While I am more than comfortable handling this, I did want to make you aware as
> I know that you may have had some interaction with Katrina between Tara's time
> and mine.  If you have any historical detail that is fact based you feel would be
> helpful for me to have, please forward over.  Additionally and lastly, if there is
> any reason for you to be on a call with Katrina, please ensure that I am aware so I
> can join.  I doubt this would include anyone other than Brent because of the
> overlapping Ohio region, but I want to make all of you aware.

(Ex.1-25 to Pl.'s Br.) (Italics in original; bolding for emphasis).

On February 23, 2011, Hughes sent Coleman an e-mail, and copying Kincaid, that was a

"re-cap" of a coaching and counseling telephone call.  (Ex. 1-32 to Pl.'s Br.).

Coleman responded to that e-mail on the same day, also copying[3] Kincaid.  (Ex. 1-34 to Pl.'s Br.).  In her e-mail, Coleman started off by saying "I don't understand WHY you insist on making a bad situation worst [sic].  Again you are continuously singling me out, harassing, bullying and grossly mistreating me even . . . discriminating against me."  (*Id.*).  Coleman addressed multiple things she was unhappy about in the e-mail.  Towards the end of the e-mail, Coleman stated "[d]uring my 18 months with Cardinal I have received positive written performance feedback from several folks that have backgrounds rooted and grounded within Ambulatory care."  (*Id.*). Coleman ended the e-mail by stating:

> [T]he continuous negative written performance feedback, harassment, bullying and discrimination (designed to destroy my career with Cardinal and my character) has come from both past and current MI Region Managers (you and Tara Odell) whose backgrounds are NOT rooted and grounded in Ambulatory Care but in Operations/other divisions within Cardinal.
>
> This is very concerning.
>
> Debbie – moving forward how will you – Human Resources address this for me?
>
> Thank you for your prompt response.

(Ex. 1-35 to Pl.'s Br.).  Hughes replied to Coleman, stating as follows before addressing several specific issues raised by Coleman:

> Besides the below response, I will no longer address any issues regarding any unfair treatment towards you and/or anything related to your teammates and co-workers.  Those issues will need to be directed to HR, as they are completely unfounded and the accusations are unwarranted.

---

[3]During her employment at Cardinal Health, Coleman copied several Human Resources representatives, including Kincaid, on a large number of e-mails.  (*See, e.g.*, D.E. No. 34-2 at Pg ID 715) (stating that Kincaid had not responded to an e-mail Coleman had sent earlier that same day and stating that she needed immediate assistance.).

(*Id*.).  Hughes also stated:

> Lastly, on several occasions throughout this process you have accused me (and others) of saying things that are completely untrue.  At the very least, you have misrepresented statements made to suit your argument.  This, unfortunately, is also consistent with statements made from your previous manager.  That concern of your previous manager was documented and sent to you.  As such, your claim to "mend" any "disconnect" is completely insincere.  With that, I will no longer address any issues that are not directly related to your performance.  I will, in good faith, continue to work with you and look to help you succeed long term with Cardinal.

(*Id*.).

After sending that e-mail, Hughes then sent the entire e-mail chain to Kincaid, along with

the following:

> Debbie – this cannot continue.  She is not making any effort to achieve any goals outlined for her.  She is consistently lying about emailing, calling, etc.  But, moreover, she is openly lying about insensitive remarks/comments made by me and her teammates.  While this is certainly turning somewhat personal for me, I have to believe that this is not acceptable behavior for any Cardinal employee.  She is not only un-coachable, but she clearly is trying to artificially create bias, prejudice and ill-will that simply does not exist.  I presume this is to protect herself legally.
>
> As you and I discussed, *if we follow the current path, it could realistically be more than a year before her time with this company ends.*  Based on her continued behavior of lying, misleading and defying leadership, I cannot believe that would be acceptable.
>
> Please advise.

(*Id.*) (italics added for emphasis).

On March 23, 2011, Kincaid sent an e-mail to several managers, including Rudd, asking

them to provide the names of any individuals on their teams "that are being formally coached due

to missing objectives (not formal PIPS)."  (Ex. 7-31 to Pl.'s Br.).  Rudd replied, in pertinent part:

> Debbie,

> I believe the only employee that falls into the category you describe below is on
> Jay's team, Katrina Coleman and *I am confident you are aware of that situation!*

(*Id*.) (emphasis added).

It is undisputed that Coleman did not meet some of the objectives set forth in the STAR.
(Def.'s Stmt. at ¶ 58 & 60; Pl.'s Stmt. at ¶ 58 & 60).  For example, the STAR provided that by
March 15, 2011, Coleman was expected to reach $1200 in total gross profit in enhanced
pharmaceutical sales but she only reached $192.  (*Id*.).  The STAR provided that April 15, 2011,
Coleman was expected to reach $2300 in total gross profit in advanced pharmaceuticals but only
reached $211.  (*Id*.).

On April 11, 2011, after an approximately six-week investigation, Cardinal Health closed
its investigation into Coleman's claim of race discrimination against Hughes, concluding:

> Reporting Party's allegations of discrimination based on her race (African
> American), harassment/bullying and hostile work environment are
> unsubstantiated. Through multiple conversations with Mr. Hughes and Ms.
> Kincaid, it is clear that their dealings with Reporting Party are motivated solely by
> a desire to help her be successful at Cardinal Health going forward.  Throughout
> her employment at Cardinal, Reporting party has refused to take any coaching or
> constructive criticism, and has failed/refused to develop her pipeline.  Her
> continual narrow focus on her overall sales numbers which includes a national
> account which she did not win has significantly hindered her progress.  The
> attempts of both of Reporting Party's supervisors, one who was a female and the
> other who is African American, to evaluate and coach Reporting Party have been
> cast as discrimination/harassment without any basis.

(Def.'s Ex. V to Reply Br., D.E. No. 37-5 at Pg ID 1172).

Coleman was made aware of Cardinal Health's determination of investigation on or about
April 12, 2011.  (*See* Pl.'s 4/12/11 e-mail, D.E. No. 37-5, Pg ID 1176).

On April 13, 2011, Coleman filed a Charge of Discrimination with the EEOC, Charge
No. 471-2011-02113 ("the First Charge").  (*See* D.E. No. 34-4 at Pg ID 85).  The First Charge

11

indicated that the alleged discrimination took place on a discrete date, February 10, 2011, and the

boxes checked as to the type of discrimination alleged were race and retaliation.  In the narrative

portion of the charge, Coleman stated:

> I began working for the above-mentioned employer on 07/20/09, as a Sales
> Consultant.
>
> On or about 02/10/11, during a conference call with the Human Resources
> Director for the Midwest ("HRDM"), I informed her that I was being racial [sic]
> discriminated against by the Regional Manager.
>
> On or about 02/10/11, the Regional Manager issued me a Corrective Action
> (Strategic Training Assessment Report "S.T.A.R.")
>
> On or about 04/11/11, upon conclusion of the investigation of my allegations, the
> Director of Advised Counsel Center, informed me that she did not find any
> evidence of discrimination, harassment, bullying or a hostile working
> environment.
>
> I believe I was discriminated against by being issued a Corrective Action based on
> my race, Black, and in retaliation for complaining of a protected activity, in
> violation of Title VII of the Civil Rights Act of 1964, as amended.

(*Id*.).  Thus, Coleman's First Charge alleged that she was issued a Corrective Action based upon

race discrimination and in retaliation for her having complained about race discrimination.

In this action, Coleman testified that the "Corrective Action" she referred to in her First

Charge was actually the PIPs, not the STAR.  (Pl.'s Dep. at 131).  Coleman further testified that

the two PIPs were ultimately withdrawn, that she knew she was not going to be on any

performance improvement plan, and that instead she would be placed on a STAR.  (Pl.'s Dep. at

94).  Coleman testified that there were no disciplinary repercussions associated with the STAR.

(Pl.'s Dep. at 211).

On May 5, 2011, Rudd sent an e-mail to Hughes stating "When is the STAR for Katrina

complete?  I want to make sure if objectives are not being met we are putting her on a PIP.  Let

me know if we need to schedule a call w/HR to help support/make it happen."  (Ex. 1-57 to Pl.'s

Br.).  Hughes responded:

> The STAR was completed in mid-April. Attached is the recap sent to Katrina.
> HR and Legal was also given this detail.
>
> I have also attached the original response to the STAR in February and a couple of
> the recaps throughout the process. I cannot stress enough, there is a serious
> disconnect between her perception of her performance and reality.
>
> Please advise on next steps.

(Ex. 1-58 to Pl.'s Br.).  Rudd then responded to both Hughes and Kincaid, at the same time, as

follows:

> Debbie,
>
> I know there is sensitivity around this so I understand we need to be careful.  I am
> more than willing to tread carefully however there are more than just a few red
> flags on this one.  Ultimately, *we need the option to off-board Katrina* and we
> apparently do not have that without a PIP.  We have completed the "STAR" and I
> would like to move forward with a PIP immediately.
>
> Jay,
>
> Please put a PIP together and sent to Debbie and legal.  Lets plan on moving
> forward with the PIP no later than the end of next week.

(Ex. 1-58 to Pl.'s Br.) (emphasis added).  Rudd testified that to "off-board" he meant to

terminate.  (Pl.'s Stmt. B at ¶ 16; Rudd Dep. at 29).  Coleman, however was not placed on a PIP

after these communications.

     Amidst this history, during the summer of 2011, Cardinal Health implemented a national

restructuring and reduction in force ("RIF") in the ambulatory care sales group.  (Rudd Decl., Ex.

A to Def.'s Br.).  "Nationally, thirteen sales representative positions were eliminated as part of

this restructuring and reduction in force." (*Id*.). "Three territories in the Midwest were eliminated. One of the three territories selected for elimination was in the region managed by Jay Hughes." (*Id*).

On July 12, 2011, Coleman was informed by Hughes, via telephone, that due to a nationwide reduction in force affecting the ambulatory care business, her position was being eliminated and her employment was therefore ending. (Def.'s Stmt. at ¶ 73; Pl.'s Stmt. at ¶ 73).

Several people were involved in the decision to terminate Coleman during the restructuring, including Rudd, Hughes, and Scott Jackson – who oversaw the entire restructuring. (Rudd Dep. at 70). "The decision as to which territories would be eliminated was made based on an analysis of which territories could most easily be absorbed into other territories or handled by national account managers instead of field sales representatives." (Rudd Decl.). Coleman's territory was selected for elimination based on those criteria. (*Id*.).

On July 26, 2011, Coleman filed another Charge of Discrimination with the EEOC, Charge No. 471-2011-03040 ("the Second Charge"). (*See* D.E. No. 34-4 at Pg ID 848). That Charge indicated that the alleged discrimination took place on July 12, 2011, and the only box checked as to the type of discrimination alleged was retaliation. In the narrative portion of the charge, Coleman stated:

> My position with the above named employer began on July 20, 2009. I last held the position of Sales Consultant.
>
> On April 14, 2011, I filed a charge of discrimination with the EEOC.
>
> On July 12, 2011, I requested and was approved for FMLA. On July 18, 2011, I was notified that my position was being eliminated due to a reorganization of the business and my last day of employment would be August 12, 2011. I am the only one affected by this RIF in the Michigan Region. According to the restructure

14

> only the Pacific Northwest and West teams will be combined by the realignment
> and create five new positions.  I was never given an opportunity to apply for any
> other position.
>
> I believe I was selected for the RIF because I am on FMLA and in retaliation for
> filing a previous charge of discrimination, in violation of Title VII of the Civil
> Rights Act of 1964, as amended.

(*Id*.).  Thus, Coleman's Second Charge alleged that she was selected for the RIF in retaliation for

having taken FMLA leave and in retaliation for having previously filed an EEOC charge.

On December 21, 2011, the EEOC issued Coleman a "Right to Sue" letter with respect to

her First Charge, stating that the agency was closing its file and advising her that she could file

suit within 90 days of the notice.  (Ex. H to Def.'s Br.)

On January 25, 2012, the EEOC issued Coleman a "Right to Sue" letter with respect to

her Second Charge, stating that the agency was closing its file and advising her that she could file

suit within 90 days of the notice.  (Ex. J to Def.'s Br.)

Coleman filed this action on March 15, 2012.

## ANALYSIS

### I.   Can Plaintiff Challenge Her Termination As Based Upon Race Discrimination In This Action?

As its first challenge, Cardinal Health asserts that Coleman cannot challenge her

termination as race discrimination in this action because she has not exhausted her administrative

remedies as to such a claim.  It notes that Coleman's Second EEOC Charge only alleged that her

termination was due to retaliation.  Cardinal Health asserts that a plaintiff cannot bring a Title

VII claim that was not included in his or her EEOC charge, and directs the Court to *Younis v.*

*Pinnacle Airlines*, Inc., 610 F.3d 359, 361-62 (6th Cir. 2010).  Cardinal Health notes that "[t]he

15

only EEOC Charge that Plaintiff filed challenging her termination alleged retaliation only, not

race discrimination." (Def.'s Br. at 6).

In response, Coleman asserts that her race discrimination claim is not barred because she

filed two Charges and the First Charge included a claim for race discrimination:

> Plaintiff brought two charges with the EEOC. The first charge was for race and
> retaliation and the second charge was for retaliation. Both charges co-existed at
> the same time. Plaintiff exhausted her administrative remedies and brought both
> her claims timely.

(Pl.'s Br. at 7). This argument misses the point. Cardinal Health does not dispute that Coleman

administratively exhausted *the claims that were actually asserted* in her First and Second

Charges (ie., her discrete claims that Cardinal Health: 1) issued a Corrective Action to her on

February 10, 2011 because of race discrimination and retaliation for having complained of

discrimination; and 2) chose her for the RIF as retaliation for her having filed a prior EEOC

charge and having taken FMLA leave). What it contends, rather, is that Coleman cannot bring a

claim that was *not included* in either of her Charges – a claim that she was selected for the RIF

because of her race.

Plaintiff's brief also quotes language from *Younis,* as to the court being able to consider

claims that are reasonably related to grow out of the factual allegations in the EEOC charge, but

she does not explain how that could apply here, given the nature of her Second Charge.

In *Younis*, the Sixth Circuit explained the rationale behind the requirement that a plaintiff

exhaust his or her administrative remedies with the EEOC before filing a claim in a lawsuit:

> In designing the procedure for challenging prohibited employment
> discrimination under Title VII, Congress gave initial enforcement responsibility to
> the EEOC. Thus, an employee alleging employment discrimination in violation of
> the statute must first file an administrative charge with the EEOC within a certain

16

> time after the alleged wrongful act or acts. *See* 42 U.S.C. § 2000e-5(e)(1). The
> charge must be "sufficiently precise to identify the parties, and to describe
> generally the action or practices complained of." 29 C.F.R. § 1601.12(b). As a
> general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not
> included in his EEOC charge. *See* 42 U.S.C. § 2000e-5(f)(1); *Alexander v.
> Gardner-Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).
> This rule serves the dual purpose of giving the employer information concerning
> the conduct about which the employee complains, as well as affording the EEOC
> and the employer an opportunity to settle the dispute through conference,
> conciliation, and persuasion. *See id.* at 44, 94 S.Ct. 1011. Hence, allowing a Title
> VII action to encompass claims outside the reach of the EEOC charges would
> deprive the charged party of notice and would frustrate the EEOC's investigatory
> and conciliatory role.

*Younis*, 610 F.3d at 361-62.

The *Younis* Court also explained that: "[a]t the same time, because aggrieved employees
– and not attorneys – usually file charges with the EEOC, their *pro se* complaints are construed
liberally, so that courts may also consider claims that are reasonably related to or grow out of the
factual allegations in the EEOC charge." *Id*. at 362. "As a result, '[w]hen facts related with
respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim,
the plaintiff is not precluded from bringing suit on that claim.'" *Id*. (quoting *Davis v. Sodexho*,
157 F.3d 460, 463 (6th Cir. 1980)). "This is known as the 'expected scope of investigation test'
and requires a plaintiff to have alleged sufficient facts in his or her EEOC complaint to put the
EEOC on notice of the other claim even though the plaintiff failed to check the appropriate box
on the EEOC's complaint form." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th
Cir. 2010).

In *Younis*, the Sixth Circuit found that the allegations in the plaintiff's complaint
exceeded the scope of his EEOC charge and dismissed, as unexhausted, a hostile work
environment claim included in the complaint. There, the plaintiff filed an EEOC charge that did

17

not allege a claim of hostile work environment.  Rather, it alleged only discrete acts of

discrimination.  *Younis*, 610 F.3d a 362.  The court also dismissed, as unexhausted, a retaliation

claim included in the plaintiff's complaint, explaining:

> The EEOC form included a specific check-off box to indicate a charge of
> retaliation.  Although Younis marked other boxes on the form evincing an intent
> to charge discrimination based on religion and national origin, he did not indicate
> that he was alleging retaliation.  Moreover, there is nothing in the narrative
> portion of the EEOC charge that could be interpreted as claiming retaliation, nor
> is there any language that would have put the EEOC on notice that [the plaintiff]
> was alleging retaliation by [defendant employer].

*Id*. at 363.

Conversely, in *Spengler,* the Sixth Circuit found that the expected-scope-of-investigation

test was met.  *Spengler*, 615 F.3d at 490.  There, the plaintiff failed to check the "retaliation" box

on his EEOC charge.  Notably, however, the narrative portion of the plaintiff's EEOC charge

clearly set forth a retaliation claim.  *Id.*

In this case, on Coleman's First Charge she checked the boxes for both race

discrimination and retaliation.  Her First Charge alleged just one discrete[4] alleged discriminatory

action – having been issued a Corrective Action on February 10, 2011.  Thus, Coleman's First

Charge, filed on April 13, 2011, did not (and could not) assert any claims based upon her future

selection for the RIF that did not occur until July 12, 2011.

Unlike her First Charge, on which Coleman checked the boxes for both race

discrimination and retaliation, on her Second Charge Coleman did not check the race

discrimination box.  Moreover, the narrative portion of her Second Charge makes no reference to

---

[4]The EEOC's form allows the charging party to check a box marked "continuing action,"
but Coleman did not check that box.  Rather, Coleman indicated that both the "earliest" and the
"latest" date that the discrimination took place was "02-10-2011."

race at all.  Rather, the narrative portion of the Second Charge states that Coleman believes she was selected for the RIF because she had taken FMLA leave[5] and in retaliation for having previously filed a charge of discrimination with the EEOC.  Like the charge at issue in *Younis,* nothing in the narrative portion of Coleman's Second Charge would have put either the EEOC or Coleman's employer on notice she was claiming that she was selected for the RIF based upon race discrimination.[6]

Accordingly, the Court shall dismiss, as unexhausted, Coleman's claim that Cardinal Health selected her for the RIF based upon race discrimination.

The Court notes that on October 21, 2013, Coleman filed a "Supplemental Response With Recently Published Case."  (Docket Entry No. 39).  In that brief, she advises the Court of *Adamov v. US Bank Nat'l Assoc.*, 726 F.3d 351 (6th Cir. Aug. 13, 2013).  Coleman asserts that case supports "her position that her case should not be dismissed on jurisdictional grounds, as claimed in Defendant's Motion for Summary Judgment" and claims that "[p]ursuant to *Adamov, Id.*, "A district court may not dismiss the claim on jurisdictional grounds."  (Docket Entry No. 39).

This argument is misplaced.  In *Adamov*, the Sixth Circuit noted that exhaustion of a Title VII claim is not a *jurisdictional* requirement under Title VII – meaning a requirement that the Court may raise *sua sponte* even if the defendant does not raise exhaustion in a dispositive

---

[5]At the hearing, Coleman's Counsel confirmed that Coleman does not assert any claims under the FMLA in this action.

[6]Indeed, Coleman's own Complaint in this action states that her Second Charge alleged "retaliation."  (Pl.'s Compl. at ¶ 22).

19

motion.  As such, the Sixth Circuit concluded that the defendant in *Adamov* "forfeited the argument that Adamov did not exhaust his retaliation claim by failing to raise it to the district court."  *Id*. at 856.  Here, however, Cardinal Health *did raise* exhaustion as grounds for dismissing Coleman's claim that she was selected for the RIF due to her race.  Thus, it does not matter for purposes of this motion that exhaustion is not a jurisdictional requirement. *See Spengler, supra*, at 489-90 (noting that while exhaustion is not a "jurisdictional requirement," "administrative exhaustion is still a statutory prerequisite" to maintaining a claim and therefore considering the merits of the defendant's exhaustion challenge in the district court).  This Court therefore continues to conclude that it must dismiss, as administratively unexhausted, Coleman's claim that Cardinal Health selected her for the RIF based upon race discrimination.

Given these rulings, Coleman is still able to proceed with her two exhausted claims, that Cardinal Health: 1) issued a Corrective Action to her on February 10, 2011 because of race discrimination and in retaliation for her having complained of discrimination; and 2) chose her for the RIF on July 26, 2011, as retaliation for her having filed a prior EEOC charge.  The Court will therefore analyze Cardinal Health's remaining challenges as to those two claims.

## II.   Do Either Of Plaintiff's Exhausted Claims Survive Summary Judgment Under The Circumstantial Evidence Approach?

Coleman has offered no direct evidence in support of her Title VII race discrimination and retaliation claims.  She must therefore proceed under the familiar *McDonnell Douglas* burden-shifting analysis.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  Under that framework, Coleman must first make out a prima facie case of race discrimination or retaliation.  *Davis v. Cintas Corp*., 717 F.3d 476, 491 (6th Cir. 2013).  If she meets this

20

requirement, Cardinal Health must offer some legitimate, nondiscriminatory explanation for its challenged employment decisions.  If it does so, the burden of production shifts back to Coleman to show that Cardinal Health's proffered reason for the challenged action was pretextual.  *Id.*

**A.    Coleman's Claims Based On Her First Charge**

The first of Coleman's two exhausted claims is that Hughes (who is African-American) issued a Corrective Action to her on February 10, 2011 on account of: 1) her African-American race; and 2) in retaliation for her having complained of discrimination to Cardinal Health's Human Resources Director.

During this action, Coleman testified that the "Corrective Action" she referred to in her First Charge was actually the PIPs, not the STAR.  (Pl.'s Dep. at 131).  Coleman further testified that the two PIPs were withdrawn, that she knew she was not going to be on any performance improvement plan, and that instead she would be placed on a STAR.  (Pl.'s Dep. at 94). Coleman testified that there were no disciplinary repercussions associated with the STAR.  (Pl.'s Dep. at 211).

In seeking summary judgment as to these claims, Cardinal Health asserts that: 1) Coleman cannot establish a prima facie race discrimination or retaliation claim under Title VII because a PIP does not constitute an adverse action, and Coleman was not place on one in any event; and 2) even if Coleman could establish a prima facie case, she cannot establish that Cardinal Health's legitimate, non-discriminatory reasons for having drafted the PIPs are a pretext for retaliation or race discrimination.

To establish a prima facie case of race discrimination under Title VII, Coleman must demonstrate that: 1) she is a member of a protected class; 2) she suffered an adverse employment

21

action; 3) she was qualified for the position; and 4) a similarly-situated employee outside of the protected class was treated more favorably. *Younis*, 610 F.3d at 359.

Similarly, to establish a prima facie case of retaliation under Title VII, Coleman must show that: 1) she engaged in Title VII "protected activity;" 2) Cardinal Health knew that she had engaged in that protected activity; 3) Cardinal Health subsequently took an adverse employment action against her; and 4) the adverse action was "causally related" to the protected activity. *Brown v. VHS of Michigan, Inc.*, __ Fed. App'x. __, 2013 WL 5583818 (6th Cir. Oct. 10, 2013) (citing *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009)).

In seeking summary judgment, Cardinal Health asserts that Coleman cannot establish the adverse action element with respect to either race discrimination or retaliation. Cardinal Health states that the Sixth Circuit has "held that being placed on a Performance Improvement Plan is not sufficient to constitute an adverse employment action" as matter of law and directs the Court to *Agnew v. BASF Corp.*, 286 F.3d 307, 310-1 (6th Cir. 2002); *Bacon v. Honda of America Mfg., Inc.*, 192 Fed. App'x. 337, 339 & 343 (6th Cir. 1999); *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999); and *Davidson v. Allsteel, Inc.*, 2011 U.S. Dist. LEXIS 17190 (E.D. Mich. 2011). Thus, Cardinal Health asserts that being placed on PIP does not constitute an adverse action for purposes of Title VII.

Moreover, Cardinal Health notes that in this case Coleman was never actually placed on a PIP. Rather, Coleman testified that the PIP was withdrawn and replaced with a coaching plan called a STAR, and Coleman testified that the Star had no disciplinary repercussions to it.

In response, Coleman asserts that she "sustained several adverse employment actions including termination." (Pl.'s Br. at 10). But Plaintiff never directly addresses Cardinal

22

Health's challenge that being placed on a PIP cannot be considered an adverse action for purposes of Title VII claims as a matter of law.

This Court concludes that, under the undisputed facts of this case, Coleman cannot establish that she incurred an adverse action by virtue of Hughes having drafted two PIPs that were later withdrawn and were never implemented. Coleman cannot establish a prima facie case of race discrimination or retaliation as to her claims based upon her First Charge.

### B.    Coleman's Claim Based On Her Second Charge

The second of Coleman's two exhausted claims is that Cardinal Health chose her for the RIF on July 26, 2011, in retaliation for her having filed a prior EEOC charge.

### 1.    Prima Facie Case

Again, to establish a prima facie case of retaliation under Title VII, a plaintiff must generally show that: 1) she engaged in Title VII "protected activity;" 2) the employer knew that she had engaged in that protected activity; 3) the employer subsequently took an adverse employment action against her; and 4) the adverse action was "causally related" to the protected activity. *Brown, supra.*

Where, as here, the claim is based on termination arising out of a work force reduction, the Sixth Circuit "has modified the fourth element to require the plaintiff to provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Rachells v. Cingular Wireless Employee Svs, LLC*, __ F.3d __, 2013 WL 5645239 (6th Cir. Oct. 17, 2013) (citing *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009), which quoted *Barnes v. GenCorp.*, 896 F.2d 1457, 1465 (6th Cir. 1990)).

23

In *Barnes*, the Sixth Circuit stated that "[i]it is important to clarify what constitutes a true work force reduction case," explaining:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Barnes*, 896 F.2d at 1465. It further explained that this standard does not create an undue hardship for plaintiffs who are eliminated as part of a work force reduction:

> If the plaintiff was truly singled out for discharge because of [his or her protected status] he or she should be able to develop enough evidence through the discovery process or otherwise to establish a prima facie case. For example, a plaintiff could establish a prima facie case by showing that he or she possessed qualifications superior to those of a [non-protected] co-worker working in the same position as the plaintiff. Alternatively, a plaintiff could show that the employer made statements indicative of a discriminatory motive as in *Laugesen*, 510 F.2d at 313. The guiding principle is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally [retaliated] against the plaintiff because of [her protected activity].

*Id.* at 1465-66.

Cardinal Health does not dispute that Coleman satisfies the first three prima facie elements, but argues that she cannot present additional evidence to show that she was singled out for discharge for impermissible reasons.

Thus, the question for the Court is whether Coleman has provided "'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'"

In her Brief, Coleman does not explain the method by which she believes she can do so.

24

As noted above, the Sixth Circuit has identified ways in which a plaintiff can make the requisite showing: 1) by showing that she had superior qualifications than non-protected workers in the same position who were not selected for the RIF; 2) by showing that the employer made statements indicative of a retaliatory motive; or 3) by presenting evidence that employees of the protected status were chosen for the RIF in statistically significant greater numbers.

It does not appear that Coleman contends that she can meet her burden by virtue of statistical[7] evidence or by establishing that she had superior qualifications than non-protected workers in the same position who were not selected for the RIF.

Rather, Coleman appears to assert that there are statements by Cardinal Health managers that show retaliatory animus.   Her Brief directs the Court to the following statements:

• In a February 18, 2011 e-mail to Rudd and other managers, Hughes said that the situation with Coleman has "escalated in an ugly way.";

• On February 23, 2011, Hughes sent an e-mail telling Kincaid that "if we follow the current bath, it could realistically be more than a year before [Coleman's] time with company ends.";

• On March 23, 2011, Rudd sent an e-mail to Kincaid stating that Coleman is the only employee that was being formally coached and missing objectives and stated, "I am confident that you are well aware of that situation!"; and

• Rudd sent an e-mail to HR that stated that they needed to put Coleman on a PIP in order to have an option to "off-board" her employment.

_____

[7]Here, Coleman does not identify any statistical evidence.  Most of the cases where statistical evidence has been considered involve whether the employer selected older employees, or employees of given race or sex, for the RIF on a disproportionate basis.  This Court is not aware of any cases where statistical evidence was used when the protected class was persons who had engaged in protected activity under Title VII.  Moreover, Cardinal Health has submitted evidence that, to its knowledge, none of the other seven sales representatives who were selected for the RIF had ever filed previous agency charges or accused the company of unlawful discrimination.  Accordingly, Coleman has not met her burden by virtue of "statistical evidence."

(*See* Pl.'s Br. at 12-13).

The Court shall examine each of these statements to consider, even when taken in the light most favorable to Coleman, they can be said to reflect retaliatory animus towards her.

As to Rudd's March 23, 2011 e-mail, he responded to that Coleman met the criteria being asked about by HR.  The fact that he commented to Kincaid, "I am confident that you are well aware of that situation" was obviously made because *Coleman herself* had copied Kincaid and Human Resources on multiple e-mails concerning the issue.  Thus, the Court fails to see how Rudd saying I am sure you aware of the situation can be construed as reflecting retaliatory animus, given that undisputed context.

Rudd does not dispute that he meant "terminate her" when he referenced being able to "off-board" Coleman.  But the e-mails he sent reflect that he instructed Hughes to prepare a PIP *if* Coleman did not meet the objectives of the STAR.  That Rudd wanted to proceed with placing Coleman on PIP if the STAR did not improve Coleman's performance, and potentially fire her if she did improve under a PIP, reflects that he wanted to terminate her if she did not improve her performance.  The Court fails to see how that can be seen as reflecting a retaliatory animus.

The two cited comments by Hughes, wherein he refers to the situation with Coleman as "escalating in a very ugly way," and complaining that the process outlined for terminating her would take too long, are of a somewhat different nature.  The Court is not aware of any cases wherein such comments were held sufficient to meet the plaintiff's prima facie burden in a RIF case.  Nevertheless, this Court will assume *arguendo* that Coleman may be able to satisfy her prima facie burden based upon the above statements and will proceed to consider whether she

can establish pretext.

### 2.     Pretext

Even if Coleman could establish a prima facie claim of retaliation based on her selection

for the RIF, the Court concludes that she cannot establish that Cardinal Health's legitimate, non-

discriminatory reason for choosing her for the RIF is a pretext for unlawful retaliation.

A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to

justify an adverse employment action by showing that the proffered reason:  1) had no basis in

fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to

warrant the challenged conduct.  *Hall, supra*; *Wexler v. White Fine Furniture*, 317 F.3d 564, 576

(6th Cir. 2003); *Manzer*, 29 F.3d at 1084.  The first type of showing consists of evidence that the

proffered bases for the termination never happened (*i.e.*, that they are factually false).  With

respect to the second kind of showing, "the plaintiff argues that the sheer weight of the

circumstantial evidence of discrimination makes it 'more likely than not' that the employer's

explanation is a pretext, or coverup."  *Id*.  The third showing consists of evidence that other

employees, particularly those not in the protected class, were not fired even though they engaged

in similar conduct.  *Id.*

Where, as here, a case is at the summary judgment stage, a plaintiff seeking to prove

illegal retaliation via indirect evidence must submit sufficient evidence from which a reasonable

jury could conclude that the defendant's legitimate, nondiscriminatory reasons for its actions are

a pretext for unlawful retaliation.  *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007).

Cardinal Health asserts that three territories in the Midwest were eliminated, including

one in the region managed by Hughes.  It further states that the decision as to which territories

27

would be eliminated was made based on an analysis of which territory could most easily be absorbed into other territories or handled by national account managers instead of field sales representatives.  (Rudd Decl., attached as Ex. A to Def.'s Br.; Hughes Dep. at 168-171).  It contends that Coleman's territory was selected for elimination based on that criteria.  (*See* Rudd Decl.).

### a.    No Basis In Fact

Coleman cannot show pretext by establishing that Cardinal Health's stated reason for eliminating her position has no basis in fact.

Coleman admits that her territory was a "start up territory" and that it was the smallest in the Midwest region by gross profit.  (Def.'s Stmt. at ¶ 84; Pl.'s Stmt. at ¶ 84).  She further admits that the Southeast Michigan territories managed by Snella and Philport were each substantially larger than her territory and that each generated more than twice the gross profit as her territory. (*Id*. at ¶ 85).  It is also undisputed that after the elimination of Coleman's position, no replacement was hired for her territory, and that the accounts formerly in Coleman's territory were redistributed and are currently being handled by either Philport or by the national inside sales team, which is an office-based team that does not include field representatives.  (*Id*. at ¶¶ 86-87).

### b.    Insufficient To Warrant The Challenged Conduct

The third type of pretext showing – that the proffered reason was insufficient to warrant the challenged conduct –  consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct.  *Id.*

This type of showing does not appear to have any application here and Coleman does not

assert otherwise.

### c.      Did Not Actually Motivate The Challenged Conduct

The second type of pretext showing is that the proffered reason did not actually motivate the defendant's challenged conduct. With respect to that kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence" of retaliation "makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Wexler, supra.*

Coleman's brief makes multiple arguments in an attempt to establish pretext that appear to fall under this method. (Pl.'s Br. at 14-16). She asserts that "[t]here is more than sufficient doubt cast upon Defendant's decision to RIF Katrina Coleman." (Pl.'s Br. at 14).

### 1)      Timing Of Conversations Regarding Terminating Plaintiff And Her Selection For RIF

Coleman asserts that "there is the evidence that Hughes, and Rudd were having conversations on how to get rid of Katrina as early as March 2011." (Pl.'s Br. at 15). She asserts that "there is more than sufficient evidence that substantiates that Jay Hughes and Brian Rudd wanted Katrina Coleman terminated, after they knew she was making allegations against Jay Hughes for race discrimination, harassment, bullying, and retaliation. They had knowledge of these complaints in February 2011." (Pl.'s Br. at 15). Coleman contends that there was "discussion between Jay Hughes and his regional Manager, Brian Rudd, shortly after Katrina Coleman first complained of race discrimination, retaliation, harassment, etc. to Hughes and HR. Brian Rudd's reaction was to 'find a way to off-board her.'" (*Id.*).

The evidence before the Court reflects that Coleman first asserted that Hughes was discriminating against her based on race on or about February 10, 2011. The cited statements

29

taken from correspondence between Rudd and Hughes, which discuss putting Coleman on a PIP if she did not meet the objectives in the STAR, and ultimately having a way to "off-board" (ie., terminate) Coleman if she did not improve, occurred several months later.  That weak temporal proximity is insufficient to establish that Cardinal Health's termination of Coleman in the July 2011 RIF was a pretext for retaliating against her for having complained of race discrimination by Hughes in February of 2011.

<strong>2)        Disagreement With Results Of Company Investigation</strong>

Coleman also contends "[t]here was a shoddy investigation performed and when the Company representative did not substantiate the claim," she filed her first EEOC complaint. (Pl.'s Br. at 15).  Although she calls the internal investigation "shoddy," Coleman does not discuss how or why the investigation could be deemed inadequate.

Cardinal Health has submitted evidence to show, moreover, that it investigated Coleman's complaint of race discrimination, conducted several interviews, and reviewed various documents before finding Coleman's discrimination/harassment claims to be without any basis. (*See* Ex. V to Def.'s Reply Br.).   Plaintiff does not explain how the mere the fact that she disagrees with the ultimate outcome of the investigation could establish pretext.

<strong>3)        Plaintiff's Disagreement With How The RIF Was<br>Handled</strong>

Coleman also takes issue with how the RIF was handled.  She asserts that "[a]lthough there was allegedly a company wide reduction in work force, there were only eight positions eliminated, out of more than 200 representatives."  (Pl.'s Br. at 15).  Coleman notes that "most of the layoffs were in the Pacific region" without explaining how those facts could be construed as

30

establishing pretext.

To the extent that Coleman is attempting establish that there was not a true RIF because only eight out of 200 positions were eliminated, that assertion fails. The Sixth Circuit has explained that "A work force reduction situation occurs when business considerations cause an employer to eliminate *one or more* positions within the company." *Barnes, supra* (emphasis added).

### 4) Not Hiring Coleman For A Position Hired Before The RIF Occurred

Coleman also appears to assert that she can establish pretext by virtue of presenting evidence that another employee, David Graves, was hired into a sales job in the Flint/Saginaw territory *before* the RIF. (*See* Pl.'s Br. at 16) (asserting "before the alleged reduction in work force in the Detroit market, Jay Hughes hired a white[8] male[9] for the Flint/Saginaw territory."). Plaintiff has failed to explain how that hiring – which occurred prior to the RIF – could establish that her later selection for the RIF was pretextual.

Moreover, Cardinal Health has presented evidence to establish that the position that was ultimately filled by Graves became open in January or February of 2011, when the employee who had it moved to a different division. Although that position was posted and discussed in team meeting calls, Coleman did not apply for that position. (Hughes Dep. at 171-73 & 193-95).

---

[8]As explained earlier, Coleman cannot proceed with a race discrimination claim based on her termination.

[9]Coleman has never asserted a gender discrimination claim against Cardinal Health.

31

5)      **Not Hiring Coleman For Position That Opened After RIF**

Coleman also seeks to establish that her selection for the RIF was a pretext for unlawful retaliation by asserting that "after the alleged reduction in work force, on September 16, 2011, Cardinal posted a position for a salesperson in Detroit." (Pl.'s Br. at 16). Coleman asserts that she "inquired into this position directly, to Debbie Kincaid, on September 28, 2011, and was told she had to go through the website to apply." (*Id*.). The Court fails to see how being told she had to formally apply for a position that opened up after the RIF had taken place could establish pretext, especially where the record evidence indicates that Cardinal had performance concerns regarding Coleman in addition to having eliminated her territory during the RIF.

Coleman also asserts that after the RIF, "Sue Philport, a Caucasian[10] female, was hired by Jay Hughes for the Detroit[11] Market." (*Id*.). Again, the Court fails to see how this establishes pretext. And, as Cardinal Health notes in its Reply, it undisputed that Philport was not a new hire – the very document that Coleman directs the Court to notes that she had been with the company "for nearly 30 years" before transferring into this position. (*See* Pl.'s Ex. 7-63).

Accordingly, the Court concludes that Coleman has not submitted sufficient evidence from which a reasonable jury could conclude that Cardinal Health's legitimate, nondiscriminatory reasons for selecting her for the RIF are a pretext for unlawful retaliation.

---

[10]Again, as explained above, Coleman cannot proceed with a race discrimination claim based on her termination.

[11]Coleman's territory while employed by Cardinal Health did not include Detroit. (Def.'s Stmt. at ¶¶ 4-5; Pl.'s Stmt. at ¶¶ 4-5).

**CONCLUSION & ORDER**

For the reasons set forth above, IT IS ORDERED that Defendant Cardinal Health's

Motion for Summary Judgment is GRANTED and this action shall be DISMISSED.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  November 7, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on
November 7, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager

33